Catherine Cabalo, Esq. (CA Bar No. 248198)
Peiffer Wolf Carr Kane Conway & Wise, LLP
4 Embarcadero Center, Suite 1400
San Francisco, CA 94111
Telephone: 415.766.3592
Facsimile: 415.402.0058
Email: ccabalo@peifferwolf.com

*Attorneys for PLAINTIFFS*
*Tifanny Espino, Lourdes Espino,*
*and Christopher Coria*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

|  |  |
|---|---|
| TIFANNY ESPINO, LOURDES ESPINO, and CHRISTOPHER CORIA,<br><br><br>Plaintiffs,<br><br>v.<br><br><br>REGENTS OF THE UNIVERSITY OF CALIFORNIA and DOES 1-20, Inclusive,<br><br>Defendants. | Case No.<br><br>Civil Rights<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES**<br><br>1. Violations of Title II of the Americans with Disabilities Act of 1990 (42 U.S.C. §§ 12101 et seq.)<br>2. Violation of the Rehabilitation Act of 1973 (29 U.S.C. § 794)<br>3. Violation of Section 1557 of the Patient Protection and Affordable Care Act (42 U.S.C. § 18116)<br>4. Violation of California Government Code Section 11135<br>5. Violations of the California Unruh Act (Cal. Civil Code § 51 *et seq.*)<br><br>**DEMAND FOR JURY TRIAL** |

COME NOW Plaintiffs Tiffany Espino, Lourdes Espino, and Christopher Coria (together, "Plaintiffs"), and hereby complain of defendant Regents of the University of California ("Regents") and Does 1-20 (Regents and Doe defendants together, "Defendants") as follows:

## INTRODUCTION

1.      This is a civil rights action involving defendant Regents denying effective communication and other reasonable disability accommodations to Plaintiff Tifanny Espino (sometimes, "Tifanny") while she was a patient at various UCLA Health ("UCLA Health") hospitals, including Ronald Reagan UCLA Medical Center, which is located at or about 757 Westwood Plaza, Los Angeles, California 90095, and UCLA Santa Monica Medical Center, which is located at or about 1250 16th Street, Santa Monica, California 90404.

2.      Tifanny is a disabled individual who is unable to speak verbally and has very limited physical mobility. She requires an iPad's text-to-speech application and a keyboard on which she types to communicate. In limited situations, Tifanny communicates using modified American Sign Language ("ASL") due to her limited hand mobility. Tifanny is completely reliant on her caretakers, which include her mother, plaintiff Lourdes Espino (sometimes, "Lourdes"), and boyfriend, plaintiff Christopher Coria (sometimes, "Christopher"), who understand Tifanny's modified ASL.

3.      The Regents, through the actions of its UCLA Health hospitals, denied Tifanny reasonable accommodations for her disabilities and also denied her effective auxiliary aids and services to facilitate effective communication between her and UCLA Health's medical staff during her medical treatment between August 19, 2020 and July 13, 2022, and on prior occasions, as well.

4.      Plaintiffs bring this lawsuit to compel the Regents to cease unlawful discriminatory practices and implement policies and procedures that will ensure reasonable accommodations, effective communication, full and equal enjoyment, and a meaningful opportunity to participate in and benefit from health care services provided at UCLA Health hospitals. Plaintiffs seek declaratory, equitable relief, monetary damages, and attorneys' fees to redress the Regents' unlawful discrimination on the basis of disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, and its implementing regulation, 28 C.F.R. Part 36; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 791 ("Rehabilitation Act") and its implementing regulations; Section 1557 of the Patient Protection

Complaint

and Affordable Care Act, 42 U.S.C. § 18116 (sometimes "ACA"); California Government Code Section 11135 ("Section 11135"); California's Unruh Civil Rights Act, Cal. Civil Code § 51 *et seq.*("Unruh Act"); and other state and common law causes of action.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1343 for Plaintiffs' claims arising under federal law, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 for Plaintiffs' claims arising under state law.

6.     Venue is proper in this court pursuant to 28 USC § 1391(b) and is founded on the fact that the real property which is the subject of this action is located in this District and that Plaintiffs' causes of action arose in this District.

7.     This case should be assigned to the Western Division of the Central District of California, as the real property which is the subject of this action is located in this Division and Plaintiffs' causes of action arose in this Division.

## THE PARTIES

8.     Plaintiff Tifanny Espino is an individual who resides in Palmdale, California with her mother, plaintiff Lourdes Espino. Tifanny has multiple severe health conditions that substantially limit the major life activities of standing, walking, seeing, eating, and speaking. Tifanny is unable to speak verbally. At all times relevant to this Complaint, Tifanny has been and is qualified as a "physically disabled person" and a "person with a disability," within the meaning of all applicable statutes and regulations.

9.     Plaintiff Lourdes Espino is an individual who resides in Palmdale, California with her daughter, Tifanny. Lourdes does not have a disability, but she assisted Tifanny with and accompanied her to all the events described in this Complaint. Lourdes is able to understand Tifanny's modified ASL.

10.     Plaintiff Christopher Coria is an individual who resides in Palmdale, California. Christopher does not have a disability, but he assisted Tifanny with and accompanied her to all the events described in this Complaint. Christopher is able to understand Tifanny's modified ASL.

11.     Defendant Regents is a California public corporation that owns, operates, and/or controls UCLA Health, a health system comprised of hospitals in the Los Angeles, California region. The Regents is a public entity subject to the requirements of Title II of the ADA and Section 504 of the Rehabilitation Act. Through its ownership, operation, and/or control of UCLA Health, the Regents is also a public accommodation subject to the requirements of Section 11135 and the Unruh Civil Rights Act. Defendant Regents and UCLA Health are recipients of federal and California state financial assistance.

12.     Does 1-5 are public entities subject to Title II of the ADA, the Rehabilitation Act, the ACA, and to all other legal requirements referred to in this Complaint, who are the owners, operators, lessors, and/or lessees of UCLA Health hospitals. Defendant Does 6-20 are employees and/or agents of the Regents and/or UCLA Health hospitals. The true names or capacities, whether individual, corporate, associate, or otherwise of defendants Does 1-20 are unknown to Plaintiffs, who therefore sue said defendants by such fictitious names. Plaintiffs are informed and believe, and thereon allege, that each of the fictitiously named defendants is in some manner legally responsible for the events and happenings herein referred to, which caused injury and damages to Plaintiffs as herein alleged. Plaintiffs pray for leave of court to amend this Complaint to show such true names and capacities when the same have been ascertained.

13.     Plaintiffs do not know the relative responsibilities of the Regents, UCLA Health, and Does 1-20 in the ownership and operation of the hospitals herein complained of, but are informed and believe, and on such information and belief allege, that at all times mentioned herein, defendants, and each of them, were the agents, servants, employees, and representatives of each of the other defendants, and performed all acts and omissions stated herein within the scope of such agency or employment or representative capacity, and/or as part of a joint venture and common enterprise with one or more of the other defendants, and are responsible in some manner for the acts and omissions of the other defendants in proximately causing the damages complained of herein. All actions alleged herein were done with the knowledge, consent approval and ratification of each of the defendants herein, including their managing agents, owners, and representatives.

**FACTUAL ALLEGATIONS**

14.     Tifanny Espino has multiple disabilities. She is unable to use her legs; cannot stand, walk, or sit up; has limited use of her hands and arms; requires use of a wheelchair for mobility; requires a feeding tube; and requires assistance with every activity of daily living. She has visual disabilities that make her sensitive to light and blur her vision. She is unable to speak verbally and requires an iPad's text-to-speech application and a keyboard to communicate in English. When Tifanny is unable to type on her iPad due to breathing difficulties, dizziness, weakness, pain, joint stiffness, or when her iPad does not work properly, she must rely on ASL, which has to be modified because of her hand deformity and limited mobility.

15.     Aside from modified ASL interpreters who can understand the subtle movements of Tifanny's hands, Lourdes and Christopher are the only people who can understand Tifanny's modified ASL, as well as bodily cues that Tifanny needs physical assistance (*e.g.*, watching for chest spasms which indicate fluid buildup that must be suctioned/drained to assist her breathing).

16.     Lourdes is not disabled and communicates primarily in English. She is Tifanny's primary caregiver and is able to understand Tifanny's modified sign language. Lourdes is Tifanny's primary caregiver and accompanies Tifanny everywhere, including to all of her medical appointments and surgeries.

17.     Christopher is not disabled and communicates primarily in English. He is one of Tifanny's caregivers and is able to understand Tifanny's modified sign language. Tifanny's boyfriend and caregiver. He also accompanies Tifanny to her medical appointments and surgeries.

**August 19, 2020 Surgery at UCLA Santa Monica Medical Center**

18.     Tifanny was scheduled to have surgery at UCLA Santa Monica Medical Center on August 19, 2020 to have a feeding tube and chest catheter placed. In the weeks preceding the surgery, Tifanny worked with her treating providers and the hospital's medical team to decide on reasonable accommodations that would take into account Tifanny's complex medical conditions and extensive history of complications with anesthesia.

19.     Tifanny's complex regional pain syndrome ("CRPS") and neuromuscular condition causes extreme pain with touch and movements, and these conditions also cause her bones and joints to be very stiff and at high risk of breaking if she were to be moved or transferred the wrong way. Tifanny also has a urological neurostimulator implant called an "interstim," which is a metal box in her abdomen along with attached wires at the base of her spine, so an additional layer of extra care must be taken when moving and transferring Tifanny as to not displace the wires.

20.     Because of COVID restrictions at the time, Plaintiffs understood that neither Lourdes nor Christopher would be allowed into the actual operating room ("OR") with Tifanny on the date of her surgery. Because of Tifanny's complex medical condition and the fact that she cannot communicate effectively without assistance, as an accommodation, Tifanny specifically requested having one of her main caregivers, Lourdes or Christopher, with her before the surgery in the "pre-op" area to interpret for her and assist her with communicating with the medical team and staff the nuances of her medical conditions and how she should be moved and handled before, during, and after any procedures. Lourdes and Christopher would also be able to communicate to staff if Tifanny was in any pain or physical distress, as Tifanny would not be able to communicate such pain on her own easily. Tifanny would also have her keyboard with her before and after the surgery, though her ability to type would be impeded after surgery while she recovered from anesthesia.

21.     Plaintiffs thoroughly discussed all of these issues and factors with Tifanny's treating providers and hospital representatives, and everyone agreed that Tifanny would be accommodated by allowing either Lourdes or Christopher to be with her before the surgery in the Pre-Op area. Anesthesiologist Dr. Dane Saska was designated the lead in ensuring everything would go smoothly on the day of the surgery.

22.     On the day of the surgery, Dr. Saska came to Tifanny's room, reviewed her modified ASL that she would use in case of emergency if she gained consciousness during the procedure, created a plan to keep Tifanny calm before the procedure, and said he would be give her a calming sedative intravenously once she arrived in the pre-op area instead of giving her an

oral medication, which would take hours to take effect due to Tiffany's slow intestinal motility. Plaintiffs and Dr. Saska agreed on this plan, and Plaintiffs waited for Tiffany's pre-op process to begin.

23.     After the hospital's transfer team was called to pick up Tiffany to take her to the OR, one member of the transport team arrived thirty minutes late, and the respiratory therapist arrived at the same time. The transport member told Tiffany that she had time to do her atrovent treatment (an inhalation aerosol), since they were waiting for the second member of the transport team to arrive. By that time, they were about forty minutes late from the scheduled time of procedures, at which point Tiffany needed to empty her bladder from waiting. The transport person told Tiffany she had time to use the commode because they were still waiting for his teammate. Once the other transport team member arrived, Tiffany was still on the commode when a phone call came in from the OR inquiring why Tiffany was not downstairs yet. The nurse informed the individuals on the phone that Tiffany was on the commode and had been waiting for the transport team, but the nurse did not explain that the transport team was forty minutes late. Rushed, the transport team began taking Tiffany downstairs, with Lourdes and Chris following.

24.     When they got to the surgical floor, Lourdes and Chris continued following Tiffany and the transfer team with the intention of having one of them remain with Tiffany in the pre-op area before Tiffany would be wheeled into the OR. However, Lourdes and Christopher were stopped by a group of OR staff members, including a nurse who immediately blocked the way between Tiffany and Lourdes and Christopher, very loudly saying, "No, there is NO ONE allowed here." Lourdes and Christopher quickly replied and tried to explain that they had an accommodation plan in place that would allow one of them to be with Tiffany in the pre-op area as everyone prepared for the procedures, and where Dr. Saska planned to give Tiffany intravenous medication to relax her before she was brought in for surgery. The nurse was combative and continued to demand Lourdes and Christopher leave immediately. The OR staff began pulling Tiffany's bed away, as Lourdes and Christopher tried desperately to explain the accommodation plan that everyone had agreed to.

25.     Tifanny began to panic, realizing she, Lourdes, and Christopher had no way of stopping the staff from wheeling her away; she would soon have her body completely surrendered to a medical team who were not apprised of her complex medical conditions; and she was ill equipped to communicate if she was in pain or had any other immediate needs. Tifanny began pressing her call-alert button on her gurney repeatedly to try to communicate that she was afraid and not ready to be wheeled in, as her accommodation plan was being completely ignored. When staff continued pushing her bed forward, Tifanny reached for her keyboard and began trying to explain herself, typing as much as she could in the rush of the emergency, but struggling with her limited dexterity and the debilitating stress of the situation.

26.     Thinking that the staff were taking her to the pre-op area, Tifanny first asked to be brought to anesthesiology and that she could not go in without her mom. Instead, OR staff pushed Tifanny on the gurney away from her family saying "No. We are taking you in immediately and no one comes with you."

27.     Lourdes and Christopher requested to see Dr. Saska so they could discuss what happened to Tifanny's accommodation plan, but to their surprise, a different anesthesiologist came out, whom Plaintiffs had never met before. Lourdes and Christopher tried to rush to explain to this new anesthesiologist that they had an accommodation plan in place for one of them to accompany Tifanny in the pre-op area where Tifanny would have an intravenous dose of calming medication administered, but hospital staff kept sternly saying, "No. The procedures are happening NOW."

28.     After some confusion about whether Tifanny was to receive oral sedative medication to calm her instead of intravenous medication, the new anesthesiologist told Tifanny he could give her some medication while she was waiting on the gurney in the hallway, and that she would be unconscious shortly. Tifanny typed in response asking, "What about after? We had many plans, he was supposed to learn my signing." Tifanny's questions were ignored, her accommodation plan was disregarded, and the medical team moved forward with preparing Tifanny for surgery.

29.     Hospital staff continued to tell Plaintiffs that no one was allowed on the floor, even in the recovery room. In escalating fear and anxiety, Tifanny typed, "What about after, I won't be able to communicate, no one will know," trying to explain that she would have absolutely no way of communicating once she was alone. No one acknowledged her pleas. Tifanny began to panic more and continued to plead with the medical team around her, "I cannot communicate with them afterward, please," again, only to be ignored. Tifanny attempted to raise the volume for her keyboard, pleading with yet again, "Please make sure my mom is there before I'm awake, I can't communicate after guys."

30.     The medical team then starting handling Tifanny without warning and without being briefed by Lourdes or Christopher, as required by Tifanny's accommodation plan. The anesthesiologist reached in to grab Tifanny's arm, presumably to check the IV to administer some medication, which was extremely excruciating for Tifanny. The anesthesiologist continued working on Tifanny's arm, despite tears streaming down her face. He clearly had no understanding of Tifanny's medical conditions or what modified ASL signs she had developed in advance with Dr. Saska. Tifanny felt trapped and anxious that she would be at the mercy of the medical staff with no way to communicate effectively with anyone. The anesthesiologist continued administering medication while painfully pressing down on Tifanny's arm. Fighting the pain, Tifanny typed and asked, "please don't press arm." He ignored Tifanny again and did not release his grip or the pressure on her arm. Feeling completely ignored and helpless, Tifanny continued to plead with him to be more gentle, saying "That's painful please don't press."

31.     During this time, Lourdes and Christopher were desperately trying to explain Tifanny's complex conditions to the medical team, trying to urge them to honor the accommodation plan they made in advance, and trying to prevent them from wheeling Tifanny away. As the anesthesiologist was administering medication to Tifanny, he turned to Christopher and asked nonchalantly, "She's never had any problems with anesthesia right?" Shocked that this medical team clearly had absolutely no background on Tifanny's extensive and complex medical history, Lourdes and Christopher replied with a simultaneous "YES. She has had a very long history of complications with anesthesia. That is why we established a specific plan beforehand."

Plaintiffs had no time to explain how Tifanny had woken up five times in the past while under anesthesia or how very high risk she is for intubation and tracheostomy if too much anesthesia is administered. Hearing this exchange between her family and the anesthesiologist, Tifanny was terrified, realizing that she was under the care of an anesthesiologist who had not been briefed on her conditions or accommodation plan. She was overwhelmed with the fact that there was absolutely nothing she could do. No matter how much she signed with modified ASL, or how many times she tried to type and use her text-to-speech app, she was fully ignored, silenced, and rendered helpless.

32.     The medical team continued forcibly rolling Tifanny's gurney away from her family, the nurse putting herself as a barrier between Tifanny and Lourdes and Christopher. Tifanny began to go into a full panic, knowing there was absolutely nothing she could do to stop them. She began crying and shaking uncontrollably as they wheeled her away from her family. The medical team continued to grab her arms, placed items on her legs and bed without warning, which caused her extreme pain. Tifanny typed "Help" several times on her keyboard, but no one assisted or responded to her. Tifanny asked the medical team around her to identify themselves by name so she could learn voices because she could not see them, but they ignored her requests. As more hands grabbed and pulled her, she kept typing, "please be slower." She also tried using ASL signs for "slow," "stop," and "please," but no one understood what she was attempting to sign because Tifanny's accommodation plan was ignored, none of the medical team were informed of her modified ASL signs, and neither Lourdes nor Christopher was allowed to translate for her.

33.     The sedative the anesthesiologist gave Tifanny in the hallway did not have any effect on her, and she continued to be terrified and feel helpless, as the uninformed medical team worked around her and on her, pulling, tugging, and grabbing her arms, legs, and feet in ways that were extremely painful and without any way for her to communicate her pain. Tifanny tried her best to ask the medical team with her keyboard and with her modified ASL to move slower when handling her to alleviate the pain from abrupt and quick movements. But again, no one acknowledged her pleas.

34.    Tifanny felt that the medical team was more interested in keeping to their schedule and made no effort to listen to her, abide by her agreed-upon accommodation plan to allow her to communicate effectively, or work with her to monitor and mitigate her pain.

35.    Robbed of the opportunity to say goodbye and have a parting moment with her family, and knowing she would be put under soon, Tiffany raised the volume of her keyboard, hoping that Lourdes and Christopher could hear her iPad when she typed goodbye and that she loved them.

36.    Tifanny was in and out of consciousness throughout the procedure, unable to convey her shock, pain, and terror, while she was sedated. She was placed in a recovery room where staff allowed Christopher to be there to interpret for Tifanny, but only after Christopher and Lourdes insisted one of them be present in the recovery room, causing a large argument with hospital staff. Tifanny was traumatized by this experience.

**December 16-19, 2020 Emergency Room at Ronald Reagan UCLA Medical Center**

37.    On December 16, 2020, Lourdes and Christopher took Tiffany to the emergency room ("ER") of Ronald Regan UCLA Medical Center because Tifanny was experiencing choking complications. Upon entry to the ER, the nurse immediately informed Lourdes and Christopher that, due to COVID concerns, they would be allowed to stay in the room but would be permanently denied re-entry if they left the room for any reason, including if they tried to get food from the cafeteria. Given the exigency of the situation and the fact that Tifanny is unable to communicate effectively without them, Lourdes and Christopher reluctantly agreed to these terms and remained with Tifanny in her ER room.

38.    Hospital staff performed an immediate X-ray and blood tests, and within a few hours, the doctors confirmed that Tifanny would need to be admitted into the hospital as an inpatient, because it would not be safe for her to return home in her critical respiratory state. They ruled out COVID and pneumonia with the initial examinations and tests but concluded they needed to perform more tests and monitoring, as her severe choking continued. Hospital staff told Plaintiffs they would get Tifanny the first bed available upstairs as soon as possible but warned them that this could take days with COVID overflow.

39.     Hospital staff made it clear to Lourdes and Christopher that were not welcome in the ER room, despite the necessity of having them there to allow Tiffany to communicate effectively and be accommodated because of her disabilities. Initially, Lourdes and Christopher were not given chairs and faced several days without food, since they were warned they could not leave to get food from the cafeteria.

40.     Tiffany's doctors agreed that having Lourdes and Christopher present with her was a medical necessity, and one doctor was kind enough to bring two small chairs for them to sit. However, starvation from lack of access to food soon became more serious, as Lourdes and Christopher became physically weaker as time passed. Nonetheless, they remained in the room with Tiffany, hoping she would be assigned a room upstairs soon.

41.     It took two days in the ER before a bed upstairs was ready for Tiffany, which Plaintiffs assumed they would be immediately transferred to together. Instead, hospital staff told Plaintiffs that no "visitors" would be allowed upstairs with her. Plaintiffs struggled to explain again Tiffany's required accommodations to the director from the ER, directors from the upstairs units, and other administrative personnel, which became increasingly exhausting and frustrating.

42.     Tiffany was ultimately denied transfer out of the ER to an upstairs unit because hospital administrators refused her request to have Lourdes and Christopher with her to help her with her disabilities and to interpret for her so she could communicate effectively with hospital staff. However, Tiffany's treating doctors advised that it was not safe for her to return home because of her precarious respiratory condition. Plaintiffs were stuck in the hospital with no idea when or how the situation would be resolved so Tiffany could receive necessary medical treatment.

43.     The next day, a unit director came to Tiffany's room and told Plaintiffs that the hospital would make a "special exception" for her rare case, since Plaintiffs were adamant about ensuring Tiffany had her caregivers and interpreters with her at all times, and that the hospital would alter its protocols to allow Tiffany one "visitor." Plaintiffs again tried to explain that Lourdes and Christopher are not "visitors," but medically necessary caregivers and interpreters, and that it would be impossible for only one of them to care for Tiffany alone, 24-7. Plaintiffs

explained that a two-person system was necessary to allow them to take breaks; have adequate help to lift Tiffany safely when necessary; and respond to Tiffany's acute medical needs, which often require immediate attention and action that nurses could not cover with typical hospital staffing (e.g., choking episodes or sudden bladder urges triggered by Tiffany's bladder implant). Despite these explanations and continued requests for reasonable accommodations for Tiffany's numerous disabilities, hospital administrators continued to view Tiffany's request to have her caregivers and interpreters with her as a "want" and not a "need."

44.     Tiffany felt humiliated and dehumanized during these negotiations with hospital staff. Several times when hospital staff spoke with Plaintiffs about Tiffany's requests for accommodation, they acknowledged Lourdes and Christopher during conversations but acted as if Tiffany was not speaking, even though she was typing and pressing the speak button on her iPad's app at the time. In at least one instance, a hospital administrator walked out of the room while Tiffany was mid-sentence, speaking via her iPad.

45.     The main hospital director insisted that according to the CDC website, only one visitor is allowed with a patient, with no exceptions to this policy. Plaintiffs later learned this was not true—that the CDC guidance at the time applied to hospitalized COVID patients only, not disabled patients who are not treating for COVID.

46.     The next morning, despite several days of doctors' assessments deeming Tiffany was in need of hospitalization, Plaintiffs were told that she was being discharged. The hospital sent Tiffany home with a basic alternate spray method for her nebulizer medication and a new medication to assist with thinning out secretions and told Plaintiffs to follow up with Tiffany's primary doctor.

47.     Plaintiffs were very confused with this series events: (1) Tiffany's treating doctors insisted on the critical need to admit her as an inpatient and (2) a bed and room upstairs opened up that Tiffany could have been moved to; yet (3) Tiffany was discharged and rushed out without any of the tests, monitoring, or care that Tiffany's doctors had earlier insisted on. Plaintiffs were far past their limits of exhaustion by then. After several days waiting for Tiffany

to receive treatment as an inpatient, Plaintiffs instead gathered Tifanny's equipment, prayed for her safety, and hoped for the best as they were ushered out of the hospital.

48.     Tifanny continued to experience severe choking when she returned home and felt she was discharged prematurely because she insisted on her rights to reasonable accommodations for her disability and to ensure she could effectively communicate with hospital staff.

### July 20, 2021 Surgery at Ronald Reagan UCLA Medical Center

49.     Because of her continued traumatizing experiences at UCLA hospitals, Tifanny made her best efforts to coordinate well in advance with her treating providers and hospital medical teams to ensure she would be properly accommodated for future procedures.

50.     She made such efforts in the week preceding her July 20, 2021 surgery to exchange her chest catheter from the right side to her left, working with a team of specialty doctors, ranging from anesthesiology, pulmonology, palliative care, interventional radiology, neurology, and primary care to coordinate her surgery in a way that would guarantee that she would be accommodated because of her disabilities and be able to communicate effectively with her medical team and hospital staff, and that they would listen and respond to Tifanny's communications regarding pain.

51.     On the day of her surgery, the attending anesthesiologist, Dr. Matthew Scott Vandiver, came to Tifanny's room to discuss her surgery and accommodation plan. Dr. Vanidver reassured Tifanny that he had spoken in advance with the team who would be in the OR to tell them about her medical conditions and how to handle her to avoid pain and injury to her prior to and after her surgery.

52.     The medical team followed the pre-op plan and completed Tifanny's surgery.

53.     Although Dr. Vandiver emphasized that he was in charge and wouldn't let anyone deviate from Tifanny's accommodation plan, that plan was not properly communicated to hospital staff, because Tifanny woke up in the OR to extreme pain, and Dr. Vandiver's voice was no longer in the room. Instead, there was a female voice on Tifanny's right side as she was moving Tifanny's limbs around in a fast and vigorous motion, causing excruciating pain with every tug and lift of her rigid limbs. Plaintiffs advised the medical team in advance that moving

Tifanny's limbs in an abrupt manner would cause her severe pain and can seriously injure her. Tifanny began panicking, as she realized she had no way to communicate. Tifanny's accommodation plan included closely monitoring her to keep her fully asleep until she would be taken to the post-anesthesia care unit or "PACU" after the surgery, where either Lourdes or Christopher would be there to assist her when she woke up and to interpret her modified ASL, as she would be too impaired from anesthesia to use her keyboard and iPad to type. These accommodations were necessary to allow Tifanny to communicate effectively while she woke up from anesthesia.

54. As the anesthesia continued to wear off, Tifanny realized her keyboard was on her lap, so she did her best to type a sentence. Her attempts kept coming out incoherently because of typos she was making without the finger coordination she needed to type. The woman in the room continued handling Tifanny roughly, continuing to cause Tifanny extreme pain. Tifanny also felt freezing cold, despite explaining to hospital staff in advance that she would need extra blankets upon waking due to her inability to regulate her body temperature.

55. The female attendant continued adjusting Tifanny's arms in a vigorous manner while quickly piling bunches of wires and tubing on her chest, the area of the surgery. Tifanny tried desperately to type another sentence through uncoordinated typos to ask the attendant her to stop, because she couldn't understand Tifanny's modified ASL signs of: "wait, stop, please." Once Tifanny finally managed to type that she needed her mom for interpreting her ASL signs, the female attendant sternly replied, "No. You are going back up to your room. We don't bring family down here." Tifanny battled through the pain and lingering anesthesia to place her fingers on the correct keys so she could continue to type: "too dizzy to type, please help, need mom or need interpreter." The attendant again rejected Tifanny's request for an interpreter, and loudly stated, "No. We are taking you to your room when we are done here." Tifanny tried explaining to the attendant that she was being moved in a way that was causing extreme pain, but the attendant ignored Tifanny's requests for help. Tifanny was forced to endure excruciating pain during this process with no interpreter to assist her.

56.     Realizing the attendant was determined to ignore Tifany's pleas for help, Tifany tried feeling around her lap for a pain medication pump, which was planned ahead with Tifany's palliative team to be placed on her lap as a fail-safe in case she was unable to communicate at any time to ensure she would have access to a small booster dose of pain medicine. However, that accommodation was also not implemented, as there was no pain pump on Tifany's lap, leaving her with no options to deal with pain other than to endure it.

57.     As Tifany was crying because of the pain, she began to feel fluid begin building up in her airways as it often does. Plaintiffs had explained this condition to Dr. Vandiver and the medical team in advance, which was another reason why it was imperative that Lourdes or Christopher be with Tifany when she woke from anesthesia. Fluid began filling up in Tifany's mouth, causing her to choke. When she is experiencing a choking episode, she is unable to communicate, as her body tightens and twitches, and she can no longer type. While Tifany lay there choking, the female attendant continued to carry on as if nothing was happening. Tifany managed to type, "HELP," and continued pressing the speak button on her keyboard repeatedly at maximum volume to try and get the attendant to notice that she was choking.

58.     At this time, Lourdes was waiting in Tifany's post-op room, where Tifany's vitals were being transmitted from the OR. Noticing that Tifany's heart rate was soaring, Lourdes called for help to get her down to the room to assist Tifany immediately. Lourdes arrived outside the OR just in time to see Tifany choking. Lourdes rushed in and asked for a suction machine, which the female attendant handed to her while shrugging them off and continuing her business around the OR. Lourdes used the tubing to suction Tifany's fluids while turning to the female attendant to ask her, "why did they not take her to the post-op PACU room as was planned?" The female attendant replied again with, "No. She is going straight to her room." When Lourdes tried to explain the extreme pain Tifany experiences from her medical conditions and how she needed immediate pain medication because the plan was to keep her sedated until she was in the PACU post-operative area, the attendant continued to deny them any help, telling Lourdes and Tifany, "No, she's had enough!" Only after Lourdes continued to press the issue and advocate for Tifany and the accommodation plan that was supposed to be in

place did the female attendant finally give Tifanny medication, but she gave her Ativan, an anti-anxiety medication, instead of medication for pain.

59.     Tifanny was so traumatized by this experience that for a time after the surgery, she was unable to distinguish Lourdes' voice when Lourdes would try to attend to Tifanny. Tifanny would panic and cry, thinking someone else was touching her and trying to move her. Tifanny's response was emotionally painful and distressing to her and to Lourdes, who experienced extreme difficulty trying to care for her daughter after the surgery.

60.     Plaintiffs reported this experience to the hospital's Office of Patient Experience but did not receive any substantive response from the hospital.

61.     To date, Tifanny experiences flashbacks and intense nightmares replaying the events of what happened to her in the OR that day.

**October 27, 2021 Surgery at Ronald Reagan UCLA Medical Center**

62.     Tifanny was scheduled to have her feeding tube replaced on October 27, 2021. She was supposed to be taken to a pre-op area to receive calming medication from anesthesia, according to the accommodation plan she and her medical team agreed upon in advance, but when the transport team arrived, they said they were taking her straight into the OR. Plaintiffs were again forced to fight and advocate very hard for Tifanny to get hospital staff to stop and wait for the anesthesiologist, who ended up coming to Tifanny's bedside to administer the pre-surgical medications that she was supposed to receive in the pre-op area.

63.     Plaintiffs thought they would be able to have a brief discussion with the medical team to explain Tifanny's extensive and complex history of complications with anesthesia, but hospital staff continued pushing her gurney to take her straight into the operating room. The anesthesiologist began administering anesthesia before Plaintiffs were able to alert him of Tifanny's prior complications with anesthesia.

64.     The anesthesia Tifanny received did not work. Although she was weak, dazed, and had difficulty typing, she was still fully awake and aware. The medical team began moving her into position for surgery, but Lourdes and Chris pleaded with them to stop. Tifanny kept trying her best to type "I'M STILL AWAKE," "PAIN, PLEASE STOP" several times, which the

anesthesiologist ignored. She could feel and hear everything going on around her, and the anesthesiologist kept saying, "She's asleep already!" as Lourdes and Chris attempted to point out that Tifanny was still clearly alert. Tifanny was given more anesthesia until she finally fell asleep, but she kept gaining consciousness throughout the procedure.

65.    When hospital staff returned Tifanny to her room, she experienced a mental breakdown from having to endure the trauma of being denied her accommodation plan and having her pleas for help to address pain ignored again.

66.    The chief anesthesiologist came by to see Tifanny the following day, along with the same representative from the Office of Patient Experience who had spoken to Plaintiffs before. Tifanny explained what happened and complained about her experience. However, she did not receive any formal acknowledgment or report confirming any further steps or investigation of her complaint.

**June 30-July 13, 2022 ER Visit, Hospital Stay, & Surgery**

**at UCLA Ronald Reagan UCLA Medical Center**

67.    Lourdes and Christopher transported Tifanny to the ER of Ronald Reagan UCLA Medical Center on June 30, 2022 because of Tifanny's ongoing and acute health complications, including trouble with urination, inability tolerate drinking small amounts of water, vomiting, extreme weight loss, a broken feeding tube, and uncontrollable abdominal pain caused by her bladder implant.

68.    Upon Tifanny's admission to the ER and then admission as an inpatient, Plaintiffs and the medical team discussed urological surgery to switch out Tifanny's interstim for a smaller device, since the implant itself had become more dislodged, causing excruciating pain and serious urination issues. Additionally, the interstim was approaching the end of its battery life, so replacing it for a new one made sense to Plaintiffs. Plaintiffs and the medical team discussed coordinating with Tifanny's urologist for help with switching the interstim while Tifanny was an inpatient at the hospital, but the hospital medical team concluded against this course of action. The medical team claimed they would not be able to address Tifanny's pain after a surgery switching the interstim. Tifanny was frustrated that the doctors who recommended installation of

18

Complaint

the interstim to begin with were now disregarding her complaints that the device was painful. Plaintiffs were also extremely distressed with the thought of what would happen when the battery for the interstim currently in Tifanny expired. Plaintiffs felt the medical team had abandoned Tifanny to fend for herself with this painful device left inside of her and left her caregivers to deal with the aftermath.

69.     The hospital's medical team ultimately decided to replace Tifanny's feeding tube only and started the process of scheduling her for that procedure.

70.     On the morning of July 5, 2022, the attending team of doctors met with Plaintiffs and confirmed that the following accommodations were approved for Tifanny's surgery: (1) Lourdes and Chris would be allowed to accompany Tifanny on the transfer to the OR to assist Tifanny with communication; (2) Tifanny's keyboard and iPad would be near her for her to use while she was awake; and (3) Lourdes would be allowed with Tifanny before the surgery and after she woke from anesthesia so that Tifanny would have someone to interpret her ASL when she is unable to type because of anesthesia. Tifanny was skeptical that this accommodation plan would be followed because of her past experiences at the hospital, but she agreed to the plan because she felt she had no other choice. The attending team also told Plaintiffs that anesthesiology would be coming that same morning to discuss and double check the accommodation plan.

71.     Shortly after this discussion with the attending team, an anesthesiologist came to see Tifanny briefly in her room with Lourdes and Christopher, but unfortunately, they did not have much time to talk. The anesthesiologist assured Plaintiffs that Tifanny's accessibility accommodations would be honored and that things would go smoothly. The anesthesiologist began administering sedating medication to Tifanny in advance of the procedure in her room to allow her to be able to endure the trip downstairs to the OR. However, Tifanny noticed right away that the medication was not having the effect it had in previous times when administered ahead. She tried to communicate the problem to the anesthesiologist, but he said that he could not give Tifanny anything further.

72.     Before Tifanny could address her options with the anesthesiologist, the transport team arrived and started handling Tifanny and working around her. Tifanny pleaded with them via her iPad, as did Lourdes and Chris, to slow down. However, the transport team continued to move quickly, moving Tifanny's blankets, placing equipment on her and her bed, and moving her legs.

73.     Tifanny was transported to the OR, where the medical team began handling Tifanny, despite her numerous pleas via her iPad to stop and slow down. Although the hospital had allowed her to have her keyboard and iPad with her to communicate, she felt that it was a useless accommodation because no one was listening to her. Hospital staff also ignored Lourdes' attempts to intervene and assist Tifanny prior to the surgery. Tifanny felt dehumanized, disregarded, and fearful of the impending pain she knew she would be forced to endure with a medical team working on her who did not care if she was complaining of pain or waking up from anesthesia.

74.     After the procedure, hospital staff ignored Tifanny's repeated requests to cover her exposed chest while being transported after the procedure. She was transported, exposed, in the main hallway to her recovery room. The experience was humiliating and embarrassing.

75.     As the anesthesia wore off and Tifanny became more lucid, she felt increased pain in her left nostril where her feeding tube was originally. After further investigation, she was horrified to discover that the medical team placed her feeding tube back in the same nostril as before, instead of switching the tube to the other side to allow her left nostril to heal from the pressure sores caused by the tube. Tifanny fears that the medical neglect of installing the new tube in the same nostril was in retaliation of her asserting her rights under the ADA. She continues to suffer from pressure sores in this nostril.

76.     To date, Tifanny continues to deal with the aftermath of the multiple traumas she experienced at UCLA hospitals because they failed to make reasonable accommodations for her disabilities and refused her requests for assistance so that she could communicate effectively with her medical team and hospital staff.

77.     In order to receive Medicaid funding, UCLA Health is required to develop policies and procedure that ensure that persons with disabilities will receive adequate and effective communication.

78.     Each time UCLA Health recertifies for Medicaid funding, it promises that it will provide and adhere to such policies.

79.     Upon information and belief, UCLA Health has not provided proper training on the treatment of patients who require interpretation services.

80.     As a result of Defendants' failure to ensure effective communication with Tifany, she received services that were inferior to those provided to patients who are not disabled, as non-disabled patients, upon information and belief, are readily and routinely provided with the opportunity to communicate with medical staff at UCLA Health hospitals and to make decisions regarding treatments and/or to give consent to such treatments.

81.     Tifany was ignored, humiliated and treated like a non-person by Defendants. Defendants intentionally discriminated against Tifany and acted with deliberate indifference to her communication needs and requests for reasonable accommodations, causing her to endure frustration, humiliation, shame, fear, anxiety, confusion, and emotional distress.

82.     Defendants retaliated against Plaintiffs for advocating for Tifany's rights to reasonable accommodations and effective communication by providing her with subpar medical care; ignoring and disregarding Tifany's attempts to communicate with hospital staff when she was able to communicate with her iPad; ignoring and disregarding Lourdes' and Chris' attempts to assist Tifany with her disabilities and to ensure Tifany could communicate effectively with hospital staff; refusing to allow Lourdes and Chris to get food or chairs to sit on while assisting Tifany in the hospital on December 16-19, 2020; and in some cases, refusing care to Tifany outright.

83.     Tifany will seek Defendants' healthcare services in the future, whether by choice or necessity, due to the proximity of UCLA Health hospital to her home. To the extent that she would attempt to seek treatment elsewhere, it is only because she is deterred from seeking

treatment at Defendants' facilities due to the discrimination she has faced and expects to face in the future.

84.    Defendants have discriminated against Plaintiffs because UCLA Health hospitals failed to make reasonable accommodations for Tifany and ensure she could effectively communicate with hospital staff, even though doing so was feasible and readily achievable; despite the fact that Defendants' services, business practices, contracts, and contractual relationships could easily be brought into compliance; and Defendants cannot demonstrate that making the requested accommodations would fundamentally alter the nature of the services, programs, or activities offered at UCLA Health hospitals.

85.    Defendants' wrongful and intentional discrimination against Tifany on the basis of her disabilities is reflected by their failure to train employees and promulgate policies of non-discrimination against disabled individuals. Despite Plaintiffs' repeated requests for accommodations, including effective communication accommodations, Defendants treated Tifany with deliberate indifference due to her disability. Defendants' denial of effective communication during Tifany's medical treatments caused her severe and significant pain, suffering, and emotional distress. As Tifany's primary caregivers, Lourdes and Christopher have suffered also as a result of the discrimination Tifany has repeatedly experienced at UCLA Health hospitals.

**FIRST CLAIM:**

**VIOLATION OF THE ADA, TITLE II**

**[42 USC §§ 12201 *et seq.*]**

**(As to all Plaintiffs against defendants Regents and Does 1-5)**

86.    Plaintiffs replead and incorporate by reference, as if fully set forth hereafter, the allegations contained in all paragraphs of this Complaint and incorporate them herein as if separately repled.

87.    At all times relevant to this action, the ADA, 42 U.S.C. §§ 12101, *et seq.* was in full force and effect and applied to the Regents' and Does 1-5's conduct.

88.    At all times relevant to this action, the United States Department of Justice

22

Complaint

regulations implementing Title II of the ADA, 28 C.F.R. Part 35, were in full force and effect and applied to Defendants' conduct.

89.     At all times relevant to this action, Tifanny had been substantially limited in the major life activities of standing, walking, eating, seeing, and speaking. Accordingly, he is considered an individual with a disability as defined under the ADA, 42 U.S.C. § 12102(2).

90.     Defendant Regents is a public entity as defined under Title II of the ADA, 42 U.S.C. § 12131(1).

91.     Defendant Does 1-5 are each a public entity as defined under Title II of the ADA, 42 U.S.C. § 12131(1).

92.     Effective January 26, 1992, Plaintiffs were entitled to the protections of the "Public Services" provision of Title II of the Americans with Disabilities Act of 1990.  Title II, Subpart A prohibits discrimination by any "public entity", including any state or local government, as defined by 42 U.S.C. § 12131.

93.     Pursuant to Title II of the ADA (42 U.S.C. § 12132), no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity.

94.     Pursuant to Title II of the ADA and its implementing regulations, a public entity may not "(i) deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service; (ii) afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others; [or] (iii) provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others." 28 C.F.R. § 35.130(b)(1).

95.     Pursuant to Title II of the ADA and its implementing regulations, a public entity is required to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public

entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).

96.     Pursuant to Title II of the ADA and its implementing regulations, a public entity "shall take appropriate steps to ensure that communications with applicants, participants, members of the public, and companions with disabilities are as effective as communications with others." 28 C.F.R. § 35.160(a)(1).

97.     Pursuant to Title II of the ADA and its implementing regulations, "A public entity shall furnish appropriate auxiliary aids and services where necessary," and "in order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability." 28 C.F.R. § 35.160(b).

98.     The Regents and Does 1-5 discriminated against Tifanny on the basis of her disability by excluding her from participation in and denying her the benefits of the services of UCLA Health hospitals, and by subjecting her to discrimination, in violation of 42 U.S.C. § 12132.

99.     The Regents and Does 1-5 further discriminated against Tifanny by refusing to provide Tifanny with auxiliary aids and services necessary to ensure effective communication and by failing to ensure effective communication through the provision of a qualified in-person interpreter.

100.     Title II of the ADA permits associational claims, such as those asserted by plaintiffs Lourdes Espino and Christopher Coria, by extending relief to "any person alleging discrimination" in violation thereof. 42 U.S.C. § 12133.

101.     As set forth above, the Regents and Does 1-5 discriminated against plaintiffs Lourdes Espino and Christopher Coria on the basis of Tifanny's disability, in violation of the ADA.

102.     As set forth above, the Regents and Does 1-5 retaliated against Plaintiffs for advocating for Tifanny's rights to reasonable accommodations and effective communication, in violation of the ADA.

103.    Plaintiffs Lourdes Espino and Christopher Coria also seek relief pursuant to remedies set forth in 42 U.S.C. § 12203. They have been discriminated against in their attempts to assist Tifanny with accessing and receiving services at UCLA Health hospitals. They have themselves experienced discrimination as a result of struggling to assist Tifanny with the barriers that limited and/or denied Tifanny access to meaningful access to services at UCLA Health hospitals.

104.    As set forth above, absent injunctive relief there is a clear risk that the Regents' and Does 1-5's actions will recur with Plaintiffs.

105.    Plaintiffs are therefore entitled to injunctive relief and declaratory relief, as well as an award of attorneys' fees, costs, and disbursements pursuant to 42 U.S.C. § 12133 and/or common law.

106.    Plaintiffs are also entitled to seek and recover compensatory damages for the injuries and loss sustained as a result of the Regents' and Does 1-5's discriminatory conduct and deliberate indifference pursuant to 42 U.S.C. § 12133.

**SECOND CAUSE OF ACTION:**

**VIOLATION OF THE REHABILITATION ACT OF 1973**

**[29 U.S.C. § 794]**

**(As to all Plaintiffs against defendants Regents and Does 1-5)**

107.    Plaintiffs replead and incorporate by reference, as if fully set forth again herein, the allegations contained in all paragraphs of this Complaint and incorporate them herein as if separately repled.

108.    At all times relevant to this action, the Rehabilitation Act, 29 U.S.C. § 794, was in full force and effect and applied to the Regents' and Does 1-5's conduct.

109.    At all times relevant to this action, the United States Department of Health and Human Services ("HHS") regulations implementing the Rehabilitation Act, 45 C.F.R. Part 84, were in full force and effect and applied to the Regents' and Does 1-5's conduct.

110.    Upon information and belief, at all times relevant to this action, the Regents (specifically UCLA Health) and Does 1-5 received federal financial assistance, including

Medicaid reimbursements or other funds, and were therefore programs or activities receiving federal financial assistance pursuant to 29 U.S.C. § 794(b). As recipients of federal funds, they are required to reasonably accommodate persons with disabilities in their facilities, programs, and activities.

111.    At all times relevant to this action, Tifanny has had substantial limitations to the major life activities of walking, standing, seeing, eating, and speaking within the meaning of the Rehabilitation Act regulations, 45 C.F.R. § 84.3(j). Accordingly, she is a qualified individual with a disability as defined in the Rehabilitation Act. 29 U.S.C. § 705(9).

112.    Pursuant to the Rehabilitation Act, "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be exclude from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . ." 29 U.S.C. § 794.

113.    Pursuant to Federal regulations implementing the Rehabilitation Act, programs or activities receiving Federal financial assistance "must afford handicapped persons equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement, in the most integrated setting appropriate to the person's needs." 45 C.F.R. § 84.4(b)(2).

114.    The Rehabilitation Act permits associational claims, such as those asserted by plaintiffs Lourdes Espino and Christopher Coria, by extending relief to "any person aggrieved" by discrimination in violation thereof. 29 U.S.C. § 794a(a)(2).

115.    As set forth above, the Regents and Does 1-5 discriminated against Plaintiffs on the basis of Tifanny's disability by denying Tifanny meaningful access to the services, programs, and benefits the Regents and Does 1-5 offer to other individuals, and by refusing to provide Tifanny with auxiliary aids and services necessary to ensure effective communication, in violation of the Rehabilitation Act. 29 U.S.C. § 794.

116.    As set forth above, the Regents and Does 1-5 further discriminated against Plaintiffs on the basis of Tifanny's disability by failing to ensure effective communication for Tifanny through the specific provision of a qualified in-person interpreter.

117.    As set forth above, the Regents and Does 1-5 retaliated against Plaintiffs for advocating for Tifanny's rights to reasonable accommodations and effective communication.

118.    Plaintiffs' injuries are ongoing so long as the Regents and Does 1-5 do not modify their policies and procedures and provide meaningful access to UCLA Health hospitals to Tifanny and her caretakers.

119.    Plaintiffs are therefore entitled to injunctive and declaratory relief, pursuant to 29 U.S.C. § 794(a).

120.    Plaintiffs are also entitled to seek and recover compensatory damages for the injuries and loss sustained as a result of the Regents' and Does 1-5's discriminatory conduct and deliberate indifference.

121.    Plaintiffs are further entitled to an award of attorney's fees, costs, and disbursements pursuant to the Rehabilitation Act, 29 U.S.C. § 794, *et seq.* and/or common law.

## THIRD CAUSE OF ACTION:

## VIOLATION OF THE PATIENT PROTECTION AND AFFORDABLE CARE ACT

## [42 U.S.C. § 18116]

### (As to Plaintiff Tifanny Espino only against defendants Regents and Does 1-5)

122.    Plaintiffs replead and incorporate by reference, as if fully set forth again herein, the allegations contained in all paragraphs of this Complaint and incorporates them herein as if separately repled.

123.    At all times relevant to this action, the ACA has been in full force and effect and has applied to the Regents' and Does 1-5's conduct.

124.    At all times relevant to this action, the ACA incorporated the definition of disability in the Rehabilitation Act, 29 U.S.C. § 705(9).

125.    At all times relevant to this action, Tifanny has had substantial limitations to the major life activities of walking, standing, seeing, eating, and speaking, and has been an individual with a disability within the meaning of the Rehabilitation Act, 29 U.S.C. § 705(9) and the ACA, 42 U.S.C. § 18116.

126.    At all times relevant to this action, Defendants received federal financial

assistance, including Medicare and/or Medicaid reimbursements, and have been principally engaged in the business of providing health care. Therefore, Defendants are health programs or activities receiving federal financial assistance pursuant to 42 U.S.C. § 18116(a).

127.     Pursuant to the ACA, "an individual shall not, on the ground prohibited under . . . section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116.

128.     Federal regulations implementing the ACA provide that "[a] covered entity shall take appropriate steps to ensure that communications with individuals with disabilities are as effective as communications with others in health programs and activities. . . ." 45 C.F.R.§ 92.202(a).

129.     Federal regulations implementing the ACA provide that "(1) A [covered] entity shall furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities, including applicants, participants, companions, and members of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a [covered] entity. . . . In determining what types of auxiliary aids and services are necessary, a public entity shall give primary consideration to the requests of individuals with disabilities. In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability." 45 C.F.R.§ 92.202(a); 28 C.F.R. § 35.160(b).

130.     As set forth above, the Regents and Does 1-5 discriminated against Tifany, on the basis of her disabilities, in violation of the ACA and its implementing regulations.

131.     As set forth above, the Regents and Does 1-5 discriminated and continue to discriminate against Tifany solely on the basis of her disabilities, denying her meaningful access to the services, program, and benefits that UCLA Health offers to other individuals, by refusing to provide auxiliary aids and services necessary to ensure effective communication in violation of the ACA, 42 U.S.C. § 18116.

132.     The Regents and Does 1-5 discriminated against Tifany by failing to ensure

effective communication through the providing of qualified sign language interpreters.

133.    The ACA, by incorporating the enforcement mechanism of the Rehabilitation Act, extends a cause of action to "any person aggrieved" by discrimination in violation thereof. 42 U.S.C. § 18116(a). And plaintiffs Lourdes Espino and Christopher Coria are persons "aggrieved" by the above-described discrimination against Tiffany Espino.

134.    The Regents and Does 1-5 have failed to implement policies, procedures, and training of staff necessary to ensure compliance with the ACA. As set out above, absent injunctive relief, there is a clear risk that the Regents' and Does 1-5's actions will recur again with Plaintiffs.

135.    Plaintiffs are therefore entitled to injunctive relief; attorney's fees, costs, and disbursements; and compensatory damages for the injuries and loss they sustained as a result of the Regents' and Does 1-5's discriminatory conduct and deliberate indifference.

**FOURTH CAUSE OF ACTION:**

**VIOLATION OF CALIFORNIA GOVERNMENT CODE SECTION 11135**

**(As to Plaintiff Tiffany Espino only against defendants Regents and Does 1-5)**

136.    Plaintiffs replead and incorporate by reference, as if fully set forth again herein, the allegations contained in all paragraphs of this Complaint and incorporates them herein as if separately repled.

137.    Upon information and belief, the Regents (specifically UCLA Health) and Does 1-5 receive financial assistance from the State of California.

138.    Tiffany is a person with a disability within the meaning of California Government Code section 11135.

139.    The Regents and Does 1-5 denied Tiffany full access to the benefits of the programs and services at UCLA Health for which the Regents and Does 1-5 receive financial assistance from the State of California, and unlawfully subjected Tiffany to discrimination within the meaning of California Government Code section 11135(a) based on their disabilities.

140.    Tiffany's injuries are ongoing so long as the Regents and Does 1-5 do not modify their policies and procedures and provide meaningful access to the programs and services at

29

Complaint

UCLA Health to Tifanny.

## FIFTH CLAIM:

## VIOLATION OF UNRUH CIVIL RIGHTS ACT

### [Cal. Civil Code §§ 51 *et seq.*]

### (As to all Plaintiffs against all Defendants)

141.    Plaintiffs replead and incorporate by reference, as if fully set forth again herein, the allegations contained in all paragraphs of this Complaint and incorporate them herein by reference as if separately repled hereafter.

142.    The Unruh Act, California Civil Code 51(b), provides:

All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, or medical condition are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.

143.    The Unruh Act further provides that "[a] violation of the right of any individual under the federal Americans with Disabilities Act of 1990 (Public Law 101 336) shall also constitute a violation of this section." Cal. Civ. Code § 51(f).

144.    Defendants and each of them are considered a business establishment within the meaning of the Unruh Civil Rights Act. Defendants are owners and operators of a business establishment.

145.    Defendants violated the Unruh Act by discriminating against Plaintiffs and also by violating Plaintiffs' rights under the ADA.

146.    Defendants have failed to implement policies, procedures, and training of staff necessary to ensure compliance with the Unruh Act. Defendants have also violated the Unruh Act by failing to modify policies and procedures as necessary to ensure Plaintiffs' full and equal access to the accommodations, advantages, facilities, privileges, and/or services of UCLA Health hospitals.

147.    Plaintiffs have experienced numerous barriers to access at UCLA Health hospitals, all of which have caused them major difficulty, discomfort, and embarrassment.

Plaintiffs suffered physical, mental and emotional damages, including statutory and compensatory damages, according to proof.

148.    On information and belief, the policies and procedures at UCLA Health hospitals have not been improved since Plaintiffs' most recent visit to a UCLA Health hospital. Plaintiffs' injuries are ongoing so long as Defendants do not modify its policies and procedures to provide meaningful access to UCLA Health hospitals to Plaintiffs.

149.    At all times herein mentioned, Defendants knew, or in the exercise of reasonable diligence should have known, that the barriers, policies and practices at UCLA Health hospitals violated disabled access requirements and standards and had a discriminatory impact upon Plaintiffs, but Defendants failed to rectify the violations, and presently continue a course of conduct in maintaining policy barriers that discriminate against Tifanny, similarly situated disabled persons, and their companions.

150.    Plaintiffs are therefore entitled to injunctive relief; attorney's fees, costs, and disbursements; and compensatory damages for the injuries and loss they sustained as a result of Defendants' discriminatory conduct as hereinbefore alleged, pursuant to Cal. Civ. Code § 52.

151.    Plaintiffs are further entitled to seek and recover exemplary damages to rectify and deter Defendants' discriminatory conduct as hereinbefore alleged, pursuant to Cal. Civ. Code § 52.

152.    With respect to Defendants' violations of the Unruh Act that are not predicated on violations of the ADA, Defendants' behavior was intentional: they were aware of and/or were made aware of their duties to refrain from establishing discriminatory policies and barriers that prevent persons with mobility disabilities like Tifanny from obtaining full and equal access to UCLA Health hospitals. Defendants' discriminatory practices and/or policies that deny full enjoyment of UCLA Health hospitals to persons with physical disabilities indicates actual and implied malice and conscious disregard for the rights of Tifanny. Plaintiffs complained on several occasions to UCLA Health representatives, to no avail. Accordingly, Defendants have engaged in willful affirmative misconduct in violating the Unruh Act.

//

## **PRAYER FOR RELIEF**

153.    Plaintiffs have no adequate remedy at law to redress the wrongs suffered as set forth in this Complaint. Plaintiffs have suffered and will continue to suffer irreparable injury as a result of the unlawful acts, omissions, policies, and practices of Defendants as alleged herein, unless Plaintiffs are granted the relief they request. Plaintiffs and Defendants have an actual controversy and opposing legal positions as to Defendants' violations of the laws of the United States and the State of California. The need for relief is critical because the rights at issue are paramount under the laws of the United States and the State of California.

WHEREFORE, Plaintiffs Tiffany Espino, Lourdes Espino, and Christopher Coria pray for judgment and the following specific relief against Defendants:

154.    Enter a declaratory judgment, pursuant to Rule 57 of the Federal Rules of Civil Procedure, stating that Defendants' practices, policies and procedures subjected Plaintiffs to unlawful discrimination in violation of Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, Section 1557 of the Patient Protection and Affordable Care Act, California Government Code Section 11135, and the Unruh Civil Rights Act.

155.    Permanently enjoin Defendants from any practice, policy, and/or procedure which will deny Plaintiffs equal access to and benefit from UCLA Health hospitals, or which deny Tiffany Espino effective communication with UCLA Health. This includes entering a permanent injunction ordering Defendants, their agents, officials, employees, and all persons and entities acting in concert with it:

      a.  To cease the unlawful acts, conditions, and practices described in this Complaint;

      b.  To immediately begin allowing Tiffany Espino to have her caregivers and interpreters with her to ensure she receives adequate healthcare for any other medical issues;

      c.  To cease discrimination against Tiffany Espino;

      d.  To promulgate and comply with policies and procedures to ensure that the Defendants and their staff do not discriminate against disabled individuals who require interpreters to communicate effectively;

     e.    To promulgate and comply with policies and procedures to ensure reasonable accommodations are provided to Tiffany Espino and similarly situated persons with disabilities in all the programs, services and activities offered at UCLA Health hospitals;

     f.    To maintain such accessible policies and procedures once they are provided;

     g.    To train Defendants' employees and agents at UCLA Health hospitals in how to accommodate the rights and needs of physically disabled persons and disabled persons requiring interpreters to communicate effectively;

     h.    Award compensatory damages to Plaintiffs;

     i.    Award reasonable costs and attorneys' fees; and

156.    Retain jurisdiction over Defendants until the Court is satisfied that Defendants' unlawful policies, practices, acts, and omissions as complained of herein no longer occur, and cannot recur;

157.    Award to Plaintiffs all appropriate damages, including but not limited to statutory, compensatory, and treble damages in an amount within the jurisdiction of the Court, all according to proof;

158.    Award to Plaintiffs all reasonable statutory attorney fees, litigation expenses, and costs of this proceeding as provided by law;

159.    Award prejudgment interest pursuant to California Civil Code § 3291;

160.    Interest on monetary awards as permitted by law; and

161.    Grant such other and further relief as this Court may deem just and proper.

Dated: August 18, 2022        PEIFFER WOLF CARR KANE CONWAY & WISE

*/s/ Catherine Cabalo*
BY: CATHERINE CABALO
Attorneys for PLAINTIFFS
TIFFANY ESPINO, LOURDES ESPINO, and
CHRISTOPHER CORIA

Complaint

## **DEMAND FOR JURY**

PLAINTIFFS hereby demand a jury for all claims for which a jury is permitted.

Dated: August 18, 2022   PEIFFER WOLF CARR KANE CONWAY & WISE

         */s/ Catherine Cabalo*
         BY: CATHERINE CABALO
         Attorneys for PLAINTIFFS
         TIFANNY ESPINO, LOURDES ESPINO, and
         CHRISTOPHER CORIA

Complaint